# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 17-1101**                                    September Term, 2017
                                                   FILED ON: JUNE 12, 2018

NEW JERSEY BOARD OF PUBLIC UTILITIES, ET AL.,
    PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
    RESPONDENT

APPIAN WAY ENERGY PARTNERS, ET AL.,
    INTERVENORS

---

Consolidated with 17-1106, 17-1107

---

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

---

Before: GARLAND, *Chief Judge*; PILLARD, *Circuit Judge*; and SILBERMAN, *Senior Circuit Judge*.

**J U D G M E N T**

These petitions for review were considered on the record from the Federal Energy Regulatory Commission and on the briefs and arguments of the parties. The Court has afforded the issues full consideration and has determined they do not warrant a published opinion. *See* FED. R. APP. P. 36; D.C. CIR. R. 36(d). It is

**ORDERED AND ADJUDGED** that the petitions for review be denied for the reasons set forth in the attached memorandum.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41.

**Per Curiam**

                              FOR THE COURT:
                              Mark J. Langer, Clerk

                BY:    /s/
                              Ken Meadows
                              Deputy Clerk

## **M E M O R A N D U M**

Congress has given the Federal Energy Regulatory Commission (FERC) authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce. 16 U.S.C. § 824(a)-(b). FERC, in turn, tasks certain non-profit entities, called regional transmission organizations, with managing aspects of the electric grid. *See Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656, 659 (D.C. Cir. 2017). One such regional transmission organization, PJM Interconnection (PJM), is responsible for the electric grid in all or part of thirteen Mid-Atlantic and Midwestern states, as well as the District of Columbia. *Id.*

As relevant to this case, PJM administers two electricity markets: the "Day-Ahead Market" and the "Real-Time Market." The "vast majority of electricity traded in the PJM markets is traded in the Day-Ahead Market, in which traders bid on electricity to be transmitted the next day." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 233 (D.C. Cir. 2013). PJM also oversees a smaller Real-Time Market, where participants correct for any unforeseen power needs by "trading electricity at prices quoted for sale and delivery within five-minute intervals." *Id.*

In both markets, PJM calculates energy prices through a method used by electricity market operators across the country. *Id.* This method sets the price of electricity equal to the cost of generation, modified at each location on the grid by the cost of congestion (that is, physical constraints in the electricity grid that make it more expensive to bring power to a given location). *Id.* at 234. (A third component of the price of electricity, the cost of transmission losses, is not material to this case. *See id.*) This system "results in higher energy prices at nodes that require the use of congested transmission lines and lower prices in less congested areas." *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 250 (D.C. Cir. 2007).

Because congestion introduces uncertainty into the power market, in 1997 PJM introduced a product called a "financial transmission right" (FTR), which allows market participants to hedge against congestion. *Id.* at 251; *see Pennsylvania-New Jersey-Maryland Interconnection*, 81 FERC ¶ 61,257, at 62,254 (1997). Each FTR is defined in terms of an amount of electricity moved between two locations: a source (where the energy is produced) and a sink (where the energy is delivered). If electricity prices at the sink are lower than at the source, congestion is positive, and the FTR pays its holder the price difference multiplied by the amount of electricity (a "prevailing-flow FTR"). But if electricity prices at the sink are higher than at the source, congestion is negative, and the holder must pay (a "counterflow FTR"). Under the current system, FTRs are awarded through a series of auctions.

-2-

In 2003, PJM introduced a second financial product, called the "auction revenue right" (ARR). *See PJM Interconnection, L.L.C.*, 102 FERC ¶ 61,276, at 61,855 (2003). ARRs provide their holders a portion of FTR auction revenues, and can also be exchanged for FTRs. Unlike FTRs, ARRs are not auctioned -- instead, PJM allocates ARRs to "load-serving entities" in consideration of their role in funding the costs of the electricity grid. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 90 n.12 (D.C. Cir. 2014) ("A 'load-serving entity' is a utility with an obligation created under law or contract to provide electricity service to end-use customers or to a distribution utility." (citation omitted)). The allocation of ARRs is based on a complex methodology that includes examining how much power could simultaneously flow over all transmission paths in the PJM region.

This case arises because, in recent years, PJM has been unable to pay holders of FTRs the full amount they are owed. Between 2010 and 2014, PJM could fund between 69% and 85% of the prevailing-flow FTRs, meaning that FTR payments were reduced pro rata. That, in turn, meant that ARRs were less valuable because FTRs were worth less at auction.

PJM sought to address this underfunding, but was unable to reach consensus among its stakeholders on any proposal. It therefore filed a petition under section 206 of the Federal Power Act, 16 U.S.C. § 824e, asking FERC to declare PJM's current market design unjust and unreasonable, and to make appropriate reforms. In 2016, after convening a technical conference, FERC found that PJM had met its burden under section 206. *PJM Interconnection, L.L.C.*, 156 FERC ¶ 61,180 (2016) ("Initial Order"), *reh'g denied*, 158 FERC ¶ 61,093 (2017) ("Rehearing Order"). It therefore ordered several modifications to PJM's existing design.

Petitioners -- two state utility commissions, two load-serving entities, and PJM's independent market monitor -- seek review of FERC's orders, challenging three of FERC's decisions. *First*, they attack FERC's determination that the costs of "balancing congestion," which arises on the Real-Time rather than the Day-Ahead Market, should be excluded from the definition and funding source of FTRs. *See* Initial Order ¶¶ 91-99; Rehearing Order ¶¶ 72-83. *Second*, they assert that FERC should have ended the practice of netting each holder's counterflow and prevailing-flow FTRs before awarding pro rata payment. *See* Initial Order ¶¶ 65-72; Rehearing Order ¶¶ 44-50. *Third*, they protest FERC's requirement that PJM update its ARR-allocation methodology by excluding unused transmission paths. *See* Initial Order ¶¶ 39-45; Rehearing Order ¶¶ 22-28.

Our review of FERC's orders is "highly deferential, as issues of rate design are

-3-

fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission." *PJM Power Providers Group v. FERC*, 880 F.3d 559, 562 (D.C. Cir. 2018) (citation omitted). Our role is "not to ask whether a regulatory decision is the best one or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Instead, we must uphold FERC's orders if "the agency has examined the relevant considerations and articulated a satisfactory reason for its actions." *Id.* (citation and internal quotation marks omitted). The deference we owe FERC is "at its zenith," moreover, where "the agency is fashioning remedies." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 541 (D.C. Cir. 2010) (citation omitted).

After a thorough review of the record, we conclude that none of petitioners' challenges can overcome the deference we owe FERC. As FERC's orders make clear, the Commission adequately considered and reasonably rejected each of the arguments that petitioners advance before our court.

1. We reject petitioners' challenge to FERC's decision to exclude balancing congestion from the funding formula for FTRs. FERC reasonably determined that including balancing congestion "reduces the efficacy of FTRs as a hedge." Initial Order ¶ 94; *see* Rehearing Order ¶¶ 78-79. In reaching that conclusion, FERC distinguished its *FirstEnergy* cases on the grounds that changed circumstances had increased the need for PJM market reform. Initial Order ¶¶ 92-93 (discussing *FirstEnergy Solutions Corp.*, 143 FERC ¶ 61,209 (2013); and *FirstEnergy Solutions Corp.*, 151 FERC ¶ 61,205 (2015)); Rehearing Order ¶¶ 73-75 (same). It also sufficiently explained why it is reasonable to require the entire market, rather than FTR holders, to bear the costs of balancing congestion, because "FTR holders do not cause and cannot predict the level of balancing congestion" and "are not the sole beneficiaries of balancing congestion." Initial Order ¶ 95; *see* Rehearing Order ¶ 80. Petitioners' assertion that FERC's action violates 16 U.S.C. § 824q has no basis in the statutory text. *See* Rehearing Order ¶ 81. And petitioners make no argument to support their view that FERC's actions imperil the Commodity Futures Trading Commission's exemption of FTRs from its regulatory ambit. *See* Rehearing Order ¶ 82.

2. We also reject petitioners' contention that FERC should have ended the netting of prevailing-flow and counterflow FTRs. FERC doubted that "the elimination of netting would improve FTR funding" because abolishing netting would simply "reallocate FTR revenue inadequacy among various market participants without actually addressing the fundamental issues associated with FTR revenue inadequacy." Initial Order ¶ 68; *see* Rehearing Order ¶ 45. And it observed that netting is "the functional equivalent of applying the same payout ratio to *both* prevailing flow and counterflow

-4-

FTR[s]," and therefore treats all FTR-holders equally. Initial Order ¶ 69; *see* Rehearing Order ¶ 47. Those conclusions provide a reasonable basis for FERC's decision.

      3. Finally, we reject petitioners' assertion that FERC should not have eliminated outdated transmission paths from the formula used to allocate ARRs. At bottom, petitioners assert that FERC should have artificially increased growth forecasts instead of electing the remedy it chose. But FERC adequately explained why it preferred to rectify the "root cause" of the problem, Initial Order ¶ 46, rather than pursue a remedy that could "distort[] the planning process, such that transmission planning is not based on expected system conditions," *id.* ¶ 42. *See* Rehearing Order ¶¶ 23-25. We have no cause to displace FERC's considered policy judgment on this matter.

      For the foregoing reasons, we deny the petitions for review.